1

2

3

4

5  UNITED STATES DISTRICT COURT

6  NORTHERN DISTRICT OF CALIFORNIA

7

8  JADE E. ANDERSON,                          No. C 10-0155 SI (pr)

9           Petitioner,                       **ORDER DENYING PETITION FOR
                                              WRIT OF HABEAS CORPUS AND
10     v.                                     GRANTING IN PART CERTIFICATE
                                              OF APPEALABILITY**
11  TINA HORNBECK, Warden,
                                              (Docket no. 16)
12           Respondent.
                                          /
13

14

15                              **INTRODUCTION**

16        This matter is now before the court for consideration of the merits of Jade E. Anderson's

17  pro se petition for writ of habeas corpus concerning her conviction in the Alameda County

18  Superior Court.[1]  For the reasons discussed below, the petition will be denied.

19

20                              **BACKGROUND**

21        In 2001, Anderson was charged, along with co-defendant Mario Gonzalez ("Mario"), with

22  the murder of Barry Gonzalez ("the victim").[2] The prosecution's theory was that Mario strangled

23  the victim to death in a motel room during a dispute over money and drugs.  Anderson, who was

24  twenty-one years old at the time, was present.  She was prosecuted on the theory that she was

25  _____

26        [1] For the record, petitioner has noted that she spells her last name "Andersen."  However,
      because all of the state courts spelled her name "Anderson," she uses that spelling in these proceedings.

27

28        [2] The two men were not related.  Because they have the same last name, however, the court
      identifies them in this order as "Mario" and "the victim," as did the state courts.

United States District Court
For the Northern District of California

an aider and abetter in a felony murder because she robbed the victim when she took money

from his pocket while he was being choked to death.  Anderson was found guilty of first degree

murder.  On appeal, the conviction was reversed because the trial court failed to instruct the jury

on lesser-included offenses to homicide.  <u>People v. Anderson</u>, 141 Cal. App. 3d 430 (2006)

("<u>Anderson I</u>").  Resp't Exh. 1 at 1, 31.[3]

On retrial in 2007, a jury again convicted Anderson of aiding and abetting a felony murder.

Cal. Penal Code. §§ 187, 189.  She was sentenced to twenty-five years to life in state prison.

The California Court of Appeal affirmed the judgment of conviction, <u>People v. Anderson</u>, 169

Cal. App. 4th 321 (2008) ("<u>Anderson II</u>"), Exh. 12, and the California Supreme Court denied

Anderson's petition for review and her petition for writ of habeas corpus.  Exhs. 15, 16.

Anderson then filed the present federal habeas corpus petition.

The following statement of facts is taken from the opinion of the California Court of

Appeal:[4]

> On both October 12 and 13, 2001, maids at a San Leandro motel saw Barry Gonzales (victim),[FN1] a 49-year-old mason, lying on the floor of his motel room.  They assumed he was sleeping. When one of the maids found him in the same position on October 14, the motel manager called the police.  It was later determined that the victim had been strangled to death.  His body was shirtless, and one pocket had been pulled through a tear in his pants. Defendant's fingerprint was on an envelope containing the victim's pay stub, found lying near his body beneath the bed sheet.

> [FN1.] There is no evidence that the victim was related to the codefendant, despite their shared surname.

> During the investigation, police learned that the victim's cell phone was missing. They obtained the records of the calls made using his cell phone and began interviewing the persons who had received those calls.  One of those persons said that a caller had initially identified herself as "Susan" and then as "Jade."

> Based on the fingerprint and phone use, police decided to interview defendant.  What would turn out to be a 12-hour interview began shortly after 1:00 p.m. on October 19, 2001. Unknown to defendant, the interview was recorded on both audiotape and videotape. The videotape constituted the primary evidence against her at trial.

---

[3]All exhibits referred to in this order are those lodged by respondent in support of the answer to the petition, unless otherwise noted.

[4]The court of appeal's statement of facts appears in the first opinion issued in <u>Anderson I</u>. Exh. 1.  In its second opinion in <u>Anderson II</u> the court of appeal adopted its original statement of facts.  Exh. 12 at 2.

United States District Court
For the Northern District of California

At the outset of the interview, defendant was told that she was not under arrest and that if she became tired the police would give her a ride "where ever [she] wanted to go." Defendant, claiming to believe that she was under investigation only for use of the stolen cell phone, initially denied any knowledge of the victim or the crime.

After over four hours of fruitless discussion, the interrogating detectives placed defendant under arrest for the victim's murder. They subsequently explained her rights under Miranda.

Over the next three to four hours of discussion, defendant, while wavering, maintained her denial. Eventually, however, defendant admitted that she was present when the victim was killed and described the events that night. She acknowledged that she knew the victim, although she was uncertain of his name, and had visited his room at the motel on at least three prior occasions, including the night before the homicide. During at least two of those visits, the victim had smoked crack.

She then explained what happened on the night of the homicide. [FN2] That night, defendant and Gonzales went to the victim's motel room after a day of drinking and smoking "crank." After they arrived, the victim asked Gonzales whether he could obtain crack cocaine. Defendant suggested that Gonzales find out whether a woman who lived upstairs in the same motel, referred to as "Brandi," had any crack cocaine to sell. Gonzales left the room. While defendant was alone with the victim, he offered to pay her to have sex with him. When she refused, he became angry and called her a "trick" and a "hooker." Eventually Gonzales returned to the room and sold the victim some crack cocaine. The victim took $5 from his wallet, paid Gonzales, put the crack cocaine in a pipe, and smoked it.

[FN2.] What follows is a broad summary of defendant's confession. Over the course of the interview her story changed somewhat; she gave inconsistent accounts of some details and many of her comments were mumbled and barely audible or entirely inaudible. Our account is based both on a reading of a transcript of the interview audiotapes prepared by the police and a viewing of the three videotapes containing the interview. We were provided with only one of the ten sequential audiotapes containing the interview.

Soon after, the victim became angry. Although defendant initially said that the victim had resumed verbally abusing her over her refusal to have sex, she later admitted that he also accused Gonzales of selling him poor quality, or even fake, crack cocaine and that he was frustrated because Gonzales could not obtain additional crack. As tensions escalated, defendant and Gonzales stood to leave. At that point, the victim approached Gonzales angrily and ordered them out. Gonzales attempted to calm him, but the victim was "going ballistic." In defendant's words, "dude was ready. Dude wanted to fight." The victim swung a crack pipe he was holding at Gonzales's face, cutting it. As the two began fighting, Gonzales put the victim in a headlock. The victim struggled violently against Gonzales's restraint, kicking, swinging the crack pipe while attempting to stab Gonzales with it, and biting Gonzales forcefully on the bicep. As the pair struggled, defendant yelled at the victim to drop the crack pipe, tried unsuccessfully to pry it from his hand, cutting her own hand in the process, and attempted to pull on the victim as he swung the pipe at Gonzales. Eventually, the two men fell to the ground, with Gonzales maintaining his arm lock around the victim's neck. At some point, the victim stopped struggling and dropped the crack pipe.

While the victim and Gonzales were on the floor, Gonzales looked up at defendant, who was bleeding, and asked whether she was okay. Then Gonzales yelled at her to "[g]et

the money" from the victim. As the combatants were lying on the floor, defendant attempted to reach into the pants pocket from which the victim had earlier taken his money. Finding his pants too tight, defendant grabbed an open knife lying nearby, which she claimed belonged to the victim, cut the pocket, and removed his money. By this time, the victim was no longer struggling, although Gonzales still held him. When Gonzales finally let go, the victim did not move or speak, although when defendant touched him she found that he was still breathing.  Defendant insisted that she was not aware the victim had died until informed by police early in the interview. She claimed that when they left she was not sure whether the victim was actually hurt or merely faking it.

After Gonzales had let go of the victim, defendant picked up a pay envelope, examined it, and, when she found it empty, hid it under the mattress. As the pair was leaving the motel room, Gonzales took the victim's cell phone, which was in the dresser, and a black bag found to contain documents, and defendant unplugged the motel room telephone, fearing that the victim would recover and call the police.  Defendant and Gonzales counted the money later, finding they had taken about $80.

Soon after the interview, police checked with "Brandi" (actually Randi), the woman defendant had mentioned during the interview. At trial, Randi testified that she was acquainted with defendant and that she had seen defendant at the motel between 5:00 and 6:00 p.m. on October 11, accompanied by a man she eventually identified as Gonzales. About 30 minutes after Randi had first seen defendant and Gonzales, Gonzales came to her room alone. He asked for a plastic bag and a bar of soap, both of which she gave to him, and he left. Randi, who was on probation for possession of methamphetamine for sale, testified that soap "was used as a substitute for drugs to sell someone." While Gonzales was there, he commented to Randi that an unidentified person, referred to only as "he," had "a stack of 50s and 20s." Later, between 6:30 and 7:00 p.m., Gonzales returned to her room, asked to use the telephone to make a call within the motel, spoke on the phone for about a minute, and left again.

The pathologist who performed an autopsy on the victim testified that he died from asphyxia due to strangulation. Two "horns" of cartilage that supported his larynx had been fractured from compression against the bones of his spine, causing his larynx to collapse when he inhaled. The injury would have caused him very quickly to begin gasping for breath, but he would have retained the ability to move.  Eventually he would have lost consciousness from lack of oxygen, and he would have died anywhere from 4 to 20 minutes after the injury occurred.

Exh. 1 at 1-5.

The central evidence admitted against Anderson at both trials was her twelve-hour taped interview with the investigating officers, which included the self-incriminating statements she made approximately eight hours into the interview.

In the present petition, Anderson brings the following claims for relief: (1) the violation of her Fifth Amendment right to counsel based on the admission of statements she made to officers after she invoked her right to counsel, prior to advisement of her Miranda rights; (2) the violation of her Fifth Amendment right against self-incrimination based on the admission of statements she made to officers after asserting her right to remain silent following her waiver of

4

United States District Court
For the Northern District of California

her <u>Miranda</u> rights; (3) the denial of her Sixth Amendment right to counsel based on her trial counsel's failure to represent her effectively at the suppression hearing held before the second trial; and (4) the violation of her rights under the Sixth and Fourteenth Amendments based on the trial court's admission of an out-of-court statement made by her co-perpetrator to a witness on the night of the murder.  Pet. at  2-4.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in Alameda County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  28 U.S.C. § 2254(b), (c).  State judicial remedies have been exhausted for the claims presented in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

United States District Court
For the Northern District of California

1    State court proceeding."  28 U.S.C. § 2254(d).

2       "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

3    arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or

4    if the state court decides a case differently than [the] Court has on a set of materially

5    indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

6       "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

7    the state court identifies the correct governing legal principle from [the] Court's decision but

8    unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal

9    habeas court may not issue the writ simply because that court concludes in its independent

10   judgment that the relevant state-court decision applied clearly established federal law

11   erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A

12   federal habeas court making the "unreasonable application" inquiry should ask whether the state

13   court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

14      Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will

15   not be overturned on factual grounds unless objectively unreasonable in light of the evidence

16   presented in the state-court proceeding."  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

17      In determining whether the state court's decision is contrary to or involved an unreasonable

18   application of clearly established federal law, or is based on an unreasonable determination of

19   the facts, a federal court looks to the decision of the highest state court to address the merits of

20   a petitioner's claims in a reasoned decision.  LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th

21   Cir. 2000).  Here, the decision of the highest state court to address the merits of Anderson's

22   claims was that of the California Court of Appeal in Anderson II, which relied heavily upon its

23   prior reasoned decision on appeal in Anderson I.

24

25                              **DISCUSSION**

26   A.   Invocation of Fifth Amendment Right to Counsel

27      Anderson claims the violation of her Fifth Amendment rights based on the state court's

28   determination that she did not invoke her right to counsel prior to being advised of her Miranda

6

rights.

1.  <u>Background</u>

Anderson voluntarily accompanied police officers Clark and Lemmon to the San Leandro police station to answer questions about what they said was her use of an allegedly stolen cell phone.  They told her that she was not under arrest and was free to leave at any time.  The interview was audio and videotaped.  It lasted approximately twelve hours.

Anderson claims that she invoked her right to counsel when, after several hours of questioning, she made the statement "I need a lawyer" after being placed under arrest but before being advised of her <u>Miranda</u> rights.  The court of appeal found the facts relevant to this claim to be as follows:

> This statement occurred four to five hours into the interview, at the end of the first of three videotapes.  Approximately 15 minutes before making the statement, and before she was placed under arrest, defendant had been under sustained questioning from Detective Ronald Clark.  Rather than responding to Clark's questions, she finally said, "Can you take me home? Can you pick me up tomorrow? I don't feel well." [FN1]  The detective responded, "Okay. Hold on," and left the room.  Defendant sat alone in the interview room for the next nine minutes. Finally, Clark and the other detective involved in the questioning, Gregory Lemmon, returned and placed her under arrest.  After a brief discussion, the detectives left her alone for two more minutes.  Then Clark returned and began to take defendant to the restroom, but, after prompting from an officer outside the room, he first removed her purse to search it, appearing to leave her alone in the room.

> [FN1.] The following description is taken from the videotape. The audiotape of this portion of the interview was not provided to this court, but the transcript of the audiotape is generally consistent with the voices audible on the videotape.

> At this point on the videotape, an officer outside the interview room, Detective Katherine Pickard, is faintly audible.  Defendant says, "I need a tampon."  Addressing defendant from off-camera, Clark notes that her purse contains only sanitary pads and asks, "Is that what you want?"  His hand is seen briefly at the edge of the video screen, holding something.  After this, defendant sits quietly for seven seconds, alone on the videotape, and then says in an even voice, "I need a lawyer."  There is no response from the police.  Based on the sound of faint voices off camera, it appears that the officers were talking to each other outside the room at the time defendant's statement was made.  Then there is a bit of laughter.  Defendant continues looking toward the door.  Twenty seconds after defendant spoke, Pickard, off-camera says, "Is that okay?" Defendant responds, "I don't care. Any one," then stands and leaves the room.  Throughout the remaining two videotapes, approximately another six or seven hours, defendant made no further reference to a lawyer, including after receiving the <u>Miranda</u>[FN2] warning regarding her right to one.

> [FN2.] <u>Miranda v. Arizona</u> (1966) 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (<u>Miranda</u>).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant moved to suppress her statement to the police.  At the suppression hearing, Lemmon testified that no one was in the room when defendant said, "I need a lawyer," and that he was not aware she had made the statement.  He testified, however, that Clark and Pickard were standing outside the open door at the time.  Clark testified that when defendant made the statement he was searching her purse at Pickard's desk, located "about five to ten feet" from the door of the interview room.  He, too, testified that he did not hear her.  Another officer, Detective Joseph Molettieri, had been posted in another room to monitor the interview by closed circuit camera, oversee the recording equipment, and take notes.  Molettieri testified that his notes reflect that the interviewing detectives left the room for three minutes.  During that interval, he heard defendant say, "I need a lawyer."  His notes expressly state that no one was in the room when the comment was made.  Soon after, Molettieri related defendant's comment to Clark, who had no reaction.

Exh. 1 at 2-4.

a.   Anderson I Court Rulings

At the suppression hearing at Anderson's first trial, the trial court found that her statement was not a "clear invocation" of her right to counsel, reasoning as follows:

With respect to "I need a lawyer" . . ., this is in a covert setting.  Ms. Anderson did not know she was being taped.  Both Sergeant Lemmon and Detective Clark's testimony was, is that they were outside the interview room.  Also if you look at Ms. Anderson during this part of the tape it's like she's daydreaming or pondering even the manner in which she says "I need a lawyer" is more of a question tha[n] a statement.  "I need a lawyer."  It's not positive.  Once again, it's as though as she's thinking out loud and pondering.  So we get to the query that [the prosecutor] raised, is there a noise when a tree falls in the forest.  Here, was this truly an invocation that she wanted, ["]I need a lawyer, I want a lawyer ["?]  I'm going to find it's not.  I attempted to find case law on this specific point.  It's interesting that this third detective [,] Detective Molettieri was there monitoring it and did testify that he turned the information over to Detective Clark.  Obviously Detective Clark did not remember it and/or did not converse with [defendant] on it.  He had indicated that he felt if he had that word that he would have addressed that in the tape. [¶]  However, I'm going to find . . . that it was not a clear invocation of her rights to sort of ponder and make this statement.  I'm basing that on my viewing of the tape.

Exh. 4 at 203:23-204:18.

The court of appeal upheld the trial court's ruling.  In contrast to the trial court's finding that Anderson had made her statement as if she were "daydreaming," "pondering" or "thinking out loud," however, the appellate court described the statement as having been made in an "even voice."  Exh. 1 at 10.  Additionally, the court acknowledged that the trial court had not made an express finding that Anderson's statement was not heard by the officers.  Exh. 1 at 13 n.8.  The court concluded, however, that there was substantial evidence to support the trial court's implicit finding that "none of the officers known to defendant heard her statement."  Exh. 1 at 13.

8

United States District Court
For the Northern District of California

Applying the standards set forth by the United States Supreme Court in <u>Davis v. United States</u>, 512 U.S. 452, 458-459 (1994), and <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991), the court of appeal concluded that Anderson had not asserted her right to counsel unequivocally and unambiguously, and affirmed the trial court's ruling that no Fifth Amendment violation had occurred. Exh. 1 at 12-15.

> b.   <u>Anderson II Court Rulings</u>

Following the court of appeal's reversal of Anderson's first conviction for instructional error, at her second trial she renewed her motion to suppress her confession based on her statement "I need a lawyer." The trial court denied her request for a complete de novo hearing, but agreed to hear the testimony of officer Katherine Pickard, who was present at the station when Anderson was being questioned, and listen to an enhanced version of certain portions of the audio portion of the videotape.

Pickard testified to the following. After Anderson was placed under arrest officer Clark walked out of the interview room with her and asked Pickard to take her to the bathroom. However, because Anderson's purse had not been searched, Clark took Anderson back into the interview room and Pickard took the purse. Pickard was at her desk, approximately five to six feet from the door to the interview room, and fifteen to twenty feet from where Anderson was seated. Exh. 3 at 58:3-22. The door to the interview room was open approximately one foot; Pickard had a direct line of sight to Anderson, and Anderson had a direct line of sight to Clark, who was intentionally standing in front of Pickard's desk with his back to the interview room in order to block Anderson's view. Exh. 3 at 61:27-62:27.

Clark intermittently walked back and forth from Pickard's desk to the interview room to converse with both Pickard and Anderson. Exh. 3 at 62:28-63:12. While at her desk, Pickard heard Anderson ask "if she was in trouble or how big a trouble she was in," at which point Clark walked into the interview room, spoke to Anderson and then came back out to Pickard and the purse. Exh. 3 at 63:4-9. When at her desk, Pickard could hear what was going on inside the interview room if the door to the room was open; from inside the interview room, voices could

be heard from outside the room whether the door was open or closed.  Exh. 3 at 65:13-16, 70:4-19.  Pickard did not at any time hear Anderson say "I need a lawyer."  Exh. 3 at 64:14-16.  Within fifteen minutes after returning from the bathroom with Anderson, Pickard saw officer Molettieri talking with either Clark or Lemmon.  Exh. 3 at 69:13-70:1.

After listening to Pickard's testimony and watching the portion of the videotape depicting the events described above, the trial court found that Pickard's testimony was consistent with the testimony offered at the first suppression hearing and supported the initial finding that Anderson had not invoked her right to counsel.  Exh. 3 at 104:25-105:7.

On appeal for the second time, Anderson argued that her self-incriminating statements should have been suppressed because her statement "I need a lawyer" was made in a manner reasonably likely to be heard by an officer, the statement was in fact heard by officer Molettieri and related to Clark, and Anderson's awareness whether Molettieri heard her statement was not relevant to the objective determination that she had invoked the right to counsel.  Exh. 9 at 10-38.  The court of appeal rejected these arguments, finding that Pickard's testimony was not new or different and, therefore, the trial court was bound by the law of the case set forth in Anderson I, and Anderson had not invoked her right to counsel for the reasons stated in Anderson I.  Exh. 12 at 17.

### 2.   Legal Standard

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence.  Miranda and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts.  Dickerson v. United States, 530 U. S. 428, 443-45 (2000).  The requirements of Miranda are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d).  Juan H. v. Allen, 408 F.3d 1262, 1271 (9th Cir. 2005).

If a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney," all questioning must cease.  Miranda, 384 U.S. at 444-45.  A suspect

United States District Court

For the Northern District of California

who has expressed a desire to have counsel present during custodial interrogation therefore is not subject to further interrogation by the authorities until counsel is made available to him, unless the suspect himself initiates further communication with the police. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," questioning need not cease. Davis v. United States, 512 U.S. 452, 459 (1994) (emphasis in original). "Rather, the suspect must unambiguously request counsel." Id. Officers are not required to clarify an ambiguous statement. Id. at 461-62.

3.   Analysis

Anderson made her statement before she was advised of her Miranda rights. The court of appeal applied Davis to find that the statement was not an unambiguous request for counsel. Davis concerned a suspect's clear invocation of his right to counsel after being advised of his Miranda rights. The Supreme Court did not address in that case whether the clear-invocation requirement also applies to statements that precede Miranda advisements, nor has it done so since Davis. "Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent only if it "applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (quotation and citation omitted). Because no Supreme Court case has clearly established that a state court may not apply a clear-invocation requirement to statements made by a suspect preceding Miranda advisements,  the state court's application of the Davis rule to Anderson's claim cannot be "contrary to" clearly established Supreme Court precedent under 28 U.S.C. § 2254(d).

United States District Court
For the Northern District of California

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13. Whether a suspect has invoked the right to counsel is an objective question; specifically, it turns on whether "any reasonable police officer . . . would understand" that the suspect expressed her desire to have a lawyer present at the interrogation. Davis, 512 at 458-59. The standard requires "at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). Both the content and context of a suspect's statement are relevant to a determination whether the right to counsel has been invoked. See Anderson v. Terhune, 516 F.3d 781, 787 (9th Cir. 2008).

In the present case, the court of appeal made the following findings:

> There is little question that the statement, "I need a lawyer," spoken in a declarative manner directly to an investigating officer, would constitute an unequivocal and unambiguous invocation of [the right to counsel]. Of necessity, however, the defendant must make the statement in a manner likely to be heard by an officer, and the statement must actually be heard by the officer. The latter point is obvious. An officer cannot "reasonably . . . construe[]" a defendant's statement if it has not been heard. (McNeil v. Wisconsin, supra, 501 U.S. at p. 178.) The former point is necessary as well. An invocation of the right to counsel must be communicated to the police to be effective. Any statement not made in a manner likely to be heard by the police, such as a reference to a lawyer that is muttered under a defendant's breath, is inherently equivocal and ambiguous because it suggests that the defendant has not yet decided actually to assert his or her rights.
>
> We find substantial evidence to support the trial court's implicit factual finding that none of the officers known to defendant heard her statement. There is no evidence that Lemmon was even nearby. Although Clark was in the room seven seconds before defendant made the statement, by the time she spoke he had gone to Pickard's desk, which was five to ten feet from the door of the interviewing room. The ambient sounds on the videotape make it clear that the officers were talking among themselves at the time defendant spoke, and none of them had any reaction to her statement. Lemmon and Clark confirmed that they did not hear her.
>
> Defendant argues that Pickard may have heard defendant because she was present, heard other statements made by defendant, and was not called by the prosecution to testify at the suppression hearing. It is doubtful that the mere possibility that Pickard heard defendant would justify overturning the trial court's factual finding, given the substantial evidence to support it. In any event, reviewing the circumstances, we find it unlikely that Pickard heard defendant. Contrary to defendant's claim in her opening brief, Pickard was not "having a conversation with" defendant when she said she needed a lawyer. Rather, Pickard was outside the office and apparently conversing with others at the time. While it is true that Pickard heard a subsequent statement made by defendant, that occurred 20

United States District Court
For the Northern District of California

seconds later, after the officer had directly addressed her.  The fact that Pickard was able to hear defendant after the detective had made a direct inquiry, and therefore was paying attention, does not suggest that the detectives would have heard defendant earlier, while she was conversing with them.

Because defendant did not direct her statement to any particular officer and made the statement at a time when the officers were outside the room, talking among themselves and distracted by the search of her purse, we conclude that her statement was not made in a manner likely to be heard.  The lack of conviction implicit in her manner is confirmed by the fact that defendant did not repeat her statement when the officers failed to respond to her.  Nor did she repeat the request after the detectives told her of her rights under <u>Miranda</u>.

Because defendant did not make her statement in a manner likely to be heard by the officers of whom she was aware, the fact that the undisclosed monitoring officer heard the statement is of no constitutional significance.  Defendant was required to assert her right unequivocally and unambiguously, not simply muse about it in a manner that might inadvertently be overheard.  Nor does it matter that one of the detectives failed to follow up when he learned of defendant's statement; "no further requirement [is] imposed upon the officers to ask clarifying questions of the defendant."  (<u>People v. Gonzalez</u> [(2005)] 34 Cal.4th [1111], 1125.)

Exh. 1 at 13-15.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Williams</u>, 529 U.S. at 411.  Specifically, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree on the correctness of the state court's decision.'"  <u>Harrington v. Richter</u>, 131 S. Ct. 770, 786 (2011).  In its review of the present claim, this court has considered—as did the state  court of appeal--the relevant portions of the videotape and transcript of Anderson's interview, and the testimony and trial court rulings from the two suppression hearings.  If this court were deciding this claim directly under the Constitution, it might well reach a conclusion different from the one reached by the state court.[5]

---

[5] As noted, an objective test is applied to determine whether a suspect's statement is made in a manner that "any reasonable police officer" would understand was an expression of the desire to have a lawyer present.  <u>Davis</u>, 512 U.S. at 458-59.  The objective test "focuses on the state of mind of the suspect and not of the police . . . ."  <u>Arizona v. Roberson</u>, 486 U.S. 675, 687 (1988).  Consequently, the question that must be asked is whether, in light of all the circumstances, a reasonable officer would have heard the suspect's statement.  <u>See</u> <u>State v. Chavarria-Cruz</u>, 784 N.W.2d 355, 363 (Minn. Sup. Ct. 2010).  In deciding this question de novo, this court might give greater weight to (1) the timing and tenor of Anderson's statement and officers Clark and Pickard's ongoing interactions with her immediately before and after she

United States District Court
For the Northern District of California

However, "[a] state court must be granted a deference and latitude that are not in operation" when the case involves review under the constitutional standard itself. Id. at 785. The unreasonableness test is not a test of the reviewing court's "confidence in the result it would reach under de novo review." Id. at 786. Guided by this standard, this court must conclude that the state court's application of Davis was not unreasonable because fairminded jurists could disagree on the correctness of the state court's decision that Anderson's statement was ambiguous and could not be reasonably construed as an invocation of her Fifth Amendment right to counsel.

Based on the above, the court finds that the state court's rejection of Anderson's claim was not contrary to or an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d). Accordingly, this claim for habeas corpus relief is DENIED.

B.    Invocation of Fifth Amendment Right to Remain Silent

Anderson also claims violation of her Fifth Amendment right to remain silent after she waived her Miranda rights.

1.    Background

The court of appeal summarized the relevant facts as follows:

> Sometime after the detectives and defendant returned from the bathroom break described in the previous section, the detectives informed defendant of her rights under Miranda. After substantial further discussion, during which defendant continued to maintain her ignorance of the victim, the interview turned briefly to defendant's family. The police transcriptionists relate the conversation in the following manner, where 'Q' and 'Q1' are the words of the two detectives and 'A' is defendant: [FN10]
>
> [FN10.] As discussed in more detail in footnote 7, ante, we conclude that this transcript was prepared entirely from the audiotapes of the interview.

made the statement, Exh. 5 at 127-129, Exh. 6 (videotape of interrogation) at 4:54-5:09, (2) officer Molettieri's testimony that he told Clark about the statement before Clark returned to the interview room, Exh. 4 at 159-65, and Pickard's testimony that she saw Molettieri talking to either Clark or Lemmon before they returned to the interview room, Exh. 3 at 69:13-70:1, and (3) Clark's testimony that he "may have" had a conversation with Molettieri during the interrogation process, that if he had been made aware of Anderson's statement he would have followed up with her and ceased further questioning if she so requested, and that he advised her of her Miranda rights "shortly" after returning to the interview room, Exh. 4 at 177-181.

14

Q1.  If you truly had nothing to do with this, okay?  And you are a witness to this thing, and you are truly a witness to this incident, if you're scared out of your mind . . . I mean this has gone on for so many years in the drug world where people are afraid to give people up.  Okay?  Um, for any number of reasons, you know there's all kind of [ . . . ]

A.  Oh, my god. You guys don't fuckin' know.

Q1.  Do you?

A.  I got a family out there. My family would be killed, man.

Q.  You, you tell the truth, you can be protected.

Q1.  You can be, are they going to be any more happy with you being in jail for something you didn't do? That's screwed up too.

A.  I'm not happy about that. I'm not happy about none of it.

Q1.  Well, do the right thing.

A.  *I just want to go home.  Phone and tell her.  I don't want to be here and talk to you guys.  Please don't talk to me.*

Q1.  I will give you a phone after you do that.  I will.

A.  You lied to me earlier. You promise me?

Q1.  I promise you that I will give you a phone and let you call them and tell them to come down here. In fact, I would encourage you to do that. I will definitely.

A.  But would (unintelligible) get caught?

Q1.  Yeah, we definitely want to talk to them.

Q.  No. I want to know what happened.

Exh. 1 at 15-16.

At the suppression hearing at Anderson's first trial, both officers Lemmon and Clark testified that Anderson never stated that she wanted to terminate the interview.  When asked to review the videotape and transcript, both officers opined that the transcript was incorrect.  Exh. 4 at 39-41, 50-51, 67-69, 179, 182.  The trial court found as follows:

> Was there an invocation when she made the statement that's attributed to her in the transcript 'Please don't talk to me'[?]. . .  Yesterday afternoon I must have played that 15 or 20 times in chambers.  I played it at full volume and the way I got the complete answer was 'Just want to go home. Use your phone and tell them, tell them, hum, I'm here and talk to you guys.  Please don't,' and then I'm not sure if I really hear the word talk or some other word or expletive and then I really could not make out  what was said. [¶] Based on that ambiguity, I find that that was not an invocation and that it appears to me the transcript . . . has inaccuracies [in the] transcription of that part of the tape.

Exh. 4 at 203:7-21.

On appeal, the state appellate court found that the trial court's factual findings were supported by substantial evidence:

> Based on our review of both the video and audiotapes, we find substantial evidence to support the trial court's conclusion that defendant failed to demonstrate that she invoked her right to silence. Prior to the purported invocation, defendant and the detectives were discussing a possible threat to her family if she told them what happened. Immediately before the statement, Lemmon asked whether defendant's family would be 'happy with you being in jail for something you didn't do?' Although the police transcript records defendant's response as, 'I'm not happy about that. I'm not happy about none of it,' it is clear from the videotape that defendant actually says, 'No, *they're* not happy about that. *They're* not happy about none of it," referring to her family. Then defendant makes the statement the police transcribed as, "I just want to go home. Phone and tell her. I don't want to be here and talk to you guys. Please don't talk to me." The trial court found some of this statement to be inaudible, as we do. Our review found that the only words audible with certainty are ". . . home . . . phone and tell . . . here and talk to you guys. Please don't talk . . . .," with the ellipses indicating words that cannot be clearly understood. Defendant's claim that "[w]hat [defendant] said to the officers, and what was recorded on the audiotape was perfectly clear, if one listened to the audiotape under proper conditions" is simply not true. Most importantly, the statement purportedly containing the critical words "please don't talk to me" is not clearly audible on *either* tape. Of equal importance to our conclusion are the recollections of the officers involved and the circumstances surrounding defendant's statement. Neither of the detectives recalled defendant asking to stop the interview. In addition, the conversational context and the reactions of the parties are inconsistent with defendant having made such a request. Prior to the statement, defendant and the detectives were discussing her family. Immediately following the statement, Lemmon responded that he would give defendant a phone to call "them," which is clearly a reference to defendant's family. If defendant had actually said she no longer wanted to talk to the detectives, this response would have been a non sequitur, and defendant would presumably have reacted to Lemmon's failure to acknowledge here request. Instead, defendant responded as though his offer was an appropriate response to what she said. Aside from the words in the transcript, there is no reason to believe that defendant asked to stop the interview at this point.

Exh. 1 at 17-18 (footnote omitted).

The court of appeal also rejected Anderson's attempt to challenge the trial court's factual findings regarding the content of the tapes based on the use of a post-trial, settled statement proceeding, wherein a second judge had listened to the audiotape and made factual findings different from those of the trial judge. Exh. 1 at 6-10. In contrast to the findings made by the trial court, the settled statement judge found that the audiotape reflected Anderson's statement, "Please don't talk to me." Pet. at 3; Exh. 1 at 6.

The court explained that such a procedure was not authorized under (former) rule 32.3 of the California Rules of Court:

United States District Court

For the Northern District of California

16

United States District Court
For the Northern District of California

1

> Instead of using the settled statement procedure to fill a gap in the appellate record, defendant is attempting to use the procedure to take a second bite at the trial court's factfinding during the suppression hearing.  Dissatisfied with the conclusions of the original trial judge, defendant enlisted a second.  In so doing, defendant was using the settled statement procedure to 'create proceedings, make records, or litigate issues which [defendant] neglected to pursue earlier,' in contravention of People v. Tuilaepa, supra, 4 Cal.4th at page 585.

Exh. 1 at 9.

The court therefore found such use of the settled statement procedure inappropriate and held that, "The trial judge was the finder of fact on the motion to suppress, and we must review his findings, made at the time, under the substantial evidence test, based on the evidence available to him." Exh. 1 at 18.

Following the reversal of Anderson's first conviction, she renewed her motion to suppress evidence of her statement, claiming that the police transcript accurately reflected her request to stop the interrogation.  At the hearing on the motion, Anderson proffered the testimony of Paul Blake, a sound technician.  Blake electronically manipulated the sound on the audio track of the interrogation videotape in order to increase the clarity of the voices on the portion during which Anderson claimed to have stated that she wanted to end the interrogation.  His work was reflected in an "enhanced" CD that was played for the court. Exh. 3 at 79-83, 91, 95-96; Exh. 8.  After listening to the enhanced CD several times, the trial court found:

> I can hear, 'Please don't talk.'  I'm not sure what comes after that. [¶] . . . [¶] As a matter of fact, the Court of Appeal at page 18 [of Anderson I nonpub., supra, A108482] says as follows: Quote, 'Our review found that the only words audible with certainty are . . .' quote—the relevant portions—'. . . home . . . phone and tell . . . here and talk to you guys. Please don't talk . . .' unquote. [¶] So I think they got about as far as we did. And if that's the status of it, these other words simply cannot be clearly understood. [¶] It's not—it's not real clear. I mean, I could—I think on this record the critical words, quote, 'Please don't talk to me,' unquote, are not clearly audible on the tape I've just listened to.

Exh. 3 at 96:7-97:4.  The court denied the motion to suppress, concluding that the enhanced CD did not show an invocation of the right to silence. Exh. 3 at 104:25-105:7.

On appeal following retrial and conviction, the state appellate court upheld this determination under the law of the case doctrine:

> On remand, the only additional evidence presented by defendant bearing on this issue was a CD containing the critical portion of the tape electronically enhanced in an effort to increase the clarity of defendant's words. If the enhanced audio revealed that the police transcriptionist's version was correct, the enhanced CD would constitute just the type of

United States District Court
For the Northern District of California

new or different evidence that would justify the trial court in disregarding our ruling in Anderson I nonpub., supra, A108482. The trial court, however, concluded that defendant's words on the enhanced CD were not clear, noting, "I can hear, 'Please don't talk.' I'm not sure what comes after that," and that the clarity of the enhanced CD was no greater than the clarity of the original tape as perceived by this court in Anderson I nonpub., supra, A108482. Because the enhanced CD was no more clear than the tape available to the first trial judge, and therefore provided no new information, it did not qualify as the type of new or different evidence that would require the trial court to redetermine this suppression issue. The trial court was therefore required to, and properly did, adhere to our ruling in that decision.

Exh. 12 at 13 (footnote omitted).

2.   Legal Standard

An analysis similar to the one discussed above for when a suspect requests counsel during a custodial interrogation applies when a suspect requests to remain silent. Specifically, if a suspect indicates in any manner during questioning that he wishes to remain silent, interrogation must cease and any statement obtained thereafter is considered the product of compulsion. Miranda, 384 U.S. at 473-74. A suspect who wishes to invoke the right to remain silent must do so unambiguously. Berghuis v. Thompkins, 130 S. Ct. 2250, 2260 (2010). "A requirement of an unambiguous invocation of Miranda rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity." Id. (quoting Davis, 512 U.S. at 458-59). A suspect who "did not say that he wanted to remain silent or that he did not want to talk with the police" has not invoked his right to remain silent. Id. at 2260. A state court's application of the Davis "clear statement" rule to the invocation of the right to remain silent is not contrary to or an unreasonable application of Supreme Court precedent for purposes of § 2254(d). DeWeaver v. Runnels, 556 F.3d 995, 1002 (9th Cir. 2009).

3.   Analysis

Anderson claims her Fifth Amendment right to remain silent was violated when officers Lemmon and Clark continued to question her after she told them she did not want to talk to them any more. Her claim rests on the contention that the state court's factual finding that she did not make such a statement was contrary to the record and she was denied a full and fair hearing on

**United States District Court**
For the Northern District of California

1   the motion to suppress.

2       A federal habeas court may grant the writ if it concludes that the state court's adjudication

3   of a claim "resulted in a decision that was based on an unreasonable determination of the facts

4   in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

5   "Factual determinations by state courts are presumed correct absent clear and convincing

6   evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

7   and based on a factual determination will not be overturned on factual grounds unless objectively

8   unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2) . . . ."

9   Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). The presumption of correctness applies to

10  express and implied findings of fact by both trial and appellate courts. Sumner v. Mata, 449 U.S.

11  539, 546-547 (1981); see Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004) ("On habeas

12  review, state appellate court findings–including those that interpret unclear or ambiguous trial

13  court ruling—are entitled to the same presumption of correctness that we afford trial court

14  findings.").

15      A state court's rejection of a claim following a hearing at which directly contradictory

16  statements are offered constitutes an implied credibility determination by the state court that is

17  entitled to deference under 28 U.S.C. § 2254(d)(2). See Weaver v. Palmateer, 455 F.3d 958, 963

18  n.6 (9th Cir. 2006). Before a federal court reviewing a habeas petition challenging a state

19  conviction can find that the state court fact-finding process was defective in some material way,

20  the court "must be satisfied that any appellate court to whom the defect is pointed out would be

21  unreasonable in holding that the . . . fact-finding process was adequate." Taylor v. Maddox, 366

22  F.3d 992, 1000 (9th Cir. 2004). Where a federal habeas petitioner disagrees with a state

23  appellate court's interpretation of the record, the appellate court's factual determinations will not

24  be found unreasonable if its depiction of the trial record is accurate and the petitioner cannot

25  point to any material fact that the court failed to consider. DeWeaver, 556 F.3d at 1006-07.

26      Here, Anderson fails to present evidence sufficient to overcome the presumption of

27  correctness of the state court's factual findings. Her assertion that she invoked her right to

28  silence was rejected by two state trial judges who listened to the taped interview, read the

interview transcript and took witness testimony. Those determinations were affirmed by two appellate panels that reviewed the record and listened to the video and audiotapes of the interview. Although Anderson disagrees with the factual determination made by the state courts, she points to no material fact that any court failed to consider or to any inaccuracy in the state court record.[6]

Based on the above, the court finds that the state court's rejection of Anderson's claim that she unequivocally and unambiguously invoked her right to silence was not based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). Accordingly, this claim for habeas corpus relief is DENIED.

C.    Ineffective Assistance of Counsel

Anderson claims that she was deprived of her Sixth Amendment right to the effective assistance of counsel because her attorney at her second trial did not adequately litigate the motion to suppress based on her statement invoking her Fifth Amendment right to remain silent.

1.    Background

Anderson raised her ineffective assistance of counsel claim to the California Supreme Court in a state habeas petition; the state supreme court summarily denied the claim. Exhs. 14, 15. Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. See Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006). When confronted with such a decision, the federal court should conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly

---

[6]Anderson objects to the appellate court's refusal to consider the findings of the settled statement judge and its application of the "law of the case" doctrine. These objections do not raise cognizable claims for federal habeas corpus relief. See Swarthout v. Cooke, 131 S. Ct. 859, 861-62 (2011) (federal habeas relief is unavailable for violations of state law or alleged error in the interpretation or application of state law); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (a state court's interpretation of state law binds a federal habeas court).

United States District Court
For the Northern District of California

1    established federal law.  Id. at 1198

2

3

4         2.    Legal Standard

5         A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

6    Amendment right to counsel, which guarantees not only assistance, but effective assistance of

7    counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any

8    claim of ineffectiveness must be whether counsel's conduct so undermined the proper

9    functioning of the adversarial process that the trial cannot be relied upon as having produced a

10   just result.  Id.  The Strickland framework for analyzing ineffective assistance of counsel claims

11   is "clearly established Federal law, as determined by the Supreme Court of the United States"

12   for the purposes of 28 U.S.C. § 2254(d) analysis.  See Cullen v. Pinholster, 131 S. Ct. 1388,

13   1403 (2011).

14        In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner

15   must establish two things.  First, he must establish that counsel's performance was deficient, i.e.,

16   that it fell below an "objective standard of reasonableness" under prevailing professional norms.

17   Strickland, 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's

18   deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

19   unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

20   reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.

21

22        3.    Analysis

23             a.    Deficient Performance

24        Anderson alleges that defense counsel's performance in litigating the renewed suppression

25   motion on remand was constitutionally deficient because counsel did not adequately move to

26   admit the audiotape that the judge who prepared the settled statement had relied upon to find that

27   she had invoked her right to remain silent.  Specifically, Anderson argues that if the second trial

28   judge had listened to that audiotape, he would have found that the tape recorded her statement

21

to the police that "I don't want to be here and talk to you guys.  Please don't talk to me."

The court finds this contention without merit.  The record shows that counsel moved the second trial court to review de novo the pertinent portions of both the audiotape and videotape of Anderson's custodial interrogation.  Exh. 3 at 27:15-29:24.   The trial court denied the request.  Exh. 3 at 36:18-23.  Anderson's counsel then proffered for the court's consideration an "enhanced" version of the pertinent portions of the audio recording from the videotape of Anderson's interrogation.  Exh. 3 at 37:17-38:5.  The trial court agreed to listen to the enhanced version and to testimony from the sound technician who had produced the enhancement.  Exh. 3 at 38:12-13.

A habeas petitioner has the burden of showing through evidentiary proof that counsel's performance was deficient.  See Toomey v. Bunnell, 898 F.2d 741, 743 (9th Cir.).  Additionally, federal courts, in deciding ineffective assistance of counsel claims on habeas review, must not overlook the "wide latitude counsel must have in making tactical decisions." Cullen, 131 S. Ct. at 1406-07 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions . . . .").  Here, Anderson's claim of deficient performance fails because the evidence shows that counsel did move the second trial court to review both the audiotape and videotape that had been considered by the first trial judge and the settled statement judge, and she has not presented evidence that calls into question the strategic validity of counsel's choice to submit an enhanced version of the audiotape for the court's review when that request was denied.

    b.   Prejudice

Anderson also fails to demonstrate prejudice from counsel's alleged omission.  Although she asserts that her invocation of silence can be heard clearly on key portions of the non-enhanced audiotape, the state appellate court squarely rejected this factual claim, as discussed above in detail.  Because the factual predicate for Anderson's claim of prejudice is unsubstantiated, she cannot show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland, 466

United States District Court
For the Northern District of California

U.S. at 694.

Based on the above, this court finds that Anderson has not shown that the state court's rejection of her ineffective assistance of counsel claim was contrary to or an unreasonable application of Strickland.   Accordingly, this claim for habeas relief is DENIED.

D.   Confrontation Clause Violation

Anderson claims that the trial court's admission of out-of-court statements made by her non-testifying accomplice violated her Sixth Amendment right to confrontation.

1.   Background

Randi de Lima lived upstairs from the victim, Barry, at the Nimitz Hotel.  Exh. 3 at 259. The evening of the murder, de Lima saw Anderson and Mario, Anderson's accomplice, headed towards Barry's room. Exh. 3 at 260-62. Later that evening, Mario knocked on de Lima's door and asked her for a plastic bag and a bar of soap.  De Lima, who had past dealings with drugs, assumed that Mario intended to package and sell the soap as rock cocaine. Exh. 3 at 263-64. At Anderson's second trial, at a hearing outside of the jury's presence, the prosecutor moved to admit Mario's statement to de Lima that the victim had "fifties and twenties."  Defense counsel argued that the statement should be excluded because it was irrelevant and "testimonial" under Crawford v. Washington, 541 U.S. 36 (2004), which holds that the Sixth Amendment right to confront witnesses prohibits the introduction of testimonial statements by a non-testifying witness.  The trial court ruled that the statement was admissible for a non-hearsay purpose, i.e., to show Mario's intent to take money from the victim by criminal means, and not for the truth of whether the victim had fifties and twenties:

> Court:      All right. I am going to, you know, again it seems to me the issue is whether or not the statement is testimonial or not testimonial and it seems to me in this context and taking a look at that opinion and that footnote it doesn't seem to me that it is testimonial in nature, rather it goes to the intent of, the intent of the killer Mr. Gonzales, and so I will allow it and I will give a limiting instruction and I—we should probably talk about that now because the testimony is going to come in. Testimony is not offered for the truth of the matter stated but rather to show the intent to Mr. Gonzales, that's the purpose, isn't it?
>
> Prosecutor:  That's the purpose.

Court:      All right. And it won't be argued in any way he could have received this information from our defendant, Ms. Anderson.

Exh. 3 at 256:18-57:2.

Pursuant to the trial court's ruling, de Lima testified on direct examination as follows:

Prosecutor:      In addition to asking you for a plastic bag and some soap, did he say anything else to you?

A.    Yeah, he brought up money.

Q.    And what did he say about money?

A.    He said there was fifties and twenties, so I just assumed he was going to sell the soap as rock.

Q.    Did he say anything about when he said there was fifties and twenties, were those his words or did he relate it to an individual?

A.    He just said some guy, he didn't say where, he didn't say a name, he just said "that dude."

Q.    That dude has fifties and twenties?

A.    Yeah.

Q.    Did he indicate a direction or just that dude?

A.    He just said "that dude."

Exh. 3 at 264:-18.

Although the trial court had indicated that it would give a limiting instruction, it did not do so and Anderson's counsel did not object to the omission.

On appeal, the court of appeal rejected Anderson's objection to the trial court's admission of the statement and its failure to give a limiting instruction:

> [The issue of the trial court's failure to give the limiting instruction] was waived when defendant did not object to the court's failure. [Citation omitted.] In any event, any error from the failure to give the limiting instruction was not prejudicial.  The only conceivable prejudice from such a failure was the jury's consideration of the statements for the truth of the matters asserted, rather than merely as evidence of the boyfriend's intent.  There was no prejudice with respect to the first statement because it was not hearsay.  The boyfriend's request for soap and a plastic bag was not an assertive statement but an operative fact. [Citation omitted.] The matter asserted in the second statement–that "some guy" had $20 and $50 bills–was not in serious dispute at trial and had no significant bearing on the defendant's guilt.  During her confession, defendant acknowledged to the police that she took money from the victim's pocket and told them how much.  The exact amount was immaterial.  Even if the jury considered the boyfriend's statement as proof that the victim possessed twenties and fifties, that consideration could not have prejudiced defendant. [Citation omitted.]

> Defendant next contends that this evidence, which was used by the prosecution to prove the boyfriend's intent to obtain money by fraud from the victim, was irrelevant because the crime of obtaining money by fraud is different from the crimes with which defendant was charged. Evidence need not be so directly probative in order to be relevant, however. Regardless of whether the elements of the crimes are identical, the boyfriend's statements provided circumstantial evidence that defendant's claim to have gone to the victim's room merely to take drugs was not true. The fact that defendant went to the victim's room with a person who intended to obtain money from the victim in a criminal manner is evidence that the jury could consider in evaluating her story, its credibility, and her subsequent conduct.

Exh. 12 at 20-21.

2.   <u>Legal Standard</u>

Anderson claims that admission of de Lima's testimony about Mario's statements violated her right to confrontation under the Sixth Amendment and her right to due process.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause applies to all "testimonial" statements, whether made in or out of court, including out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay," but "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." <u>Crawford</u>, 541 U.S. at 50-51, 59 n. 9. Hearsay that is not testimonial, "while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." <u>Davis v. Washington</u>, 547 U.S. 813, 821 (2006); <u>see also</u> <u>Whorton v. Bockting</u>, 549 U.S. 406, 420 (2007) ("[T]he Confrontation Clause has no application to [nontestimonial] statements and therefore permits their admission even if they lack indicia of reliability."). The Supreme Court has not articulated a comprehensive definition of testimonial hearsay, but has said that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." <u>Crawford</u> at 68.

A criminal defendant is deprived of his Sixth Amendment right of confrontation when a facially incriminating confession of a non-testifying accomplice is introduced at their joint trial, even if the jury is instructed to consider the confession only against the accomplice. See <u>Bruton v. United States</u>, 391 U.S. 123, 126, 135-36 (1968).

25

United States District Court
For the Northern District of California

1   A showing of constitutional error under the Confrontation Clause merits habeas relief only

2   if the error was not harmless, that is, if it had a "'substantial and injurious effect or influence in

3   determining the jury's verdict.'"   Holley v. Yarborough, 568 F.3d 1091, 1100 (9th Cir. 2009)

4   (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

6   **3.   Analysis**

7   As noted, the trial court determined, under Crawford, that Mario's statements were non-

8   testimonial.  The state appellate court did not address that question directly, but found that

9   Anderson had not been prejudiced by admission of the statements because they were not

10  admitted for the purpose of establishing the truth of the matter asserted and, even if they had

11  been considered for that purpose, i.e., to establish the fact that the victim possessed bills of

12  certain denominations, such evidence was not prejudicial to the defense.

13  The state appellate court reasonably determined that Anderson's right to confrontation was

14  not violated.  The statements do not fit under any recognized category of statements the Supreme

15  Court has designated as testimonial, i.e., statements made during police interrogations, prior

16  testimony at a preliminary hearing, before a grand jury, or at a former trial.   Rather, the

17  statements were part of a private conversation with an acquaintance, which the federal courts

18  have not found testimonial.  See, e.g., States v. Franklin, 4 15 F.3d 537, 545 (6th Cir. 2005) (a

19  declarant's statements made to a friend were non-testimonial; the friend "was not a police officer

20  or a government informant seeking to elicit the statements to further a prosecution against Clarke

21  or Franklin"); United States v. Manfre, 368 F.3d 832, 838 n. 1 (8th Cir. 2004) ("Mr. Rush's

22  comments were made to loved ones or acquaintances and are not the kind of memorialized,

23  judicial-process-created evidence of which Crawford speaks"); United States v. Lee, 374 F.3d

24  637, 645 (8th Cir. 2004) ("Kehoe's statements to his mother do not implicate the core concerns

25  of the confrontation clause").

26  The fact that the statements were made by a non-testifying accomplice does not lead to a

27  different conclusion.   Bruton v United States, on which Anderson relies, concerned a

28  Confrontation Clause violation in a case involving a co-defendant's admissions.  The central

United States District Court
For the Northern District of California

element of <u>Bruton</u>'s holding was to overrule previous case law which held that a limiting instruction directing the jury not to consider the confession of an accomplice against the defendant was sufficient to obviate any hearsay or Confrontation Clause problems.  <u>See</u> <u>id.</u> at 128-136.  <u>Bruton</u> did not extend the scope of Confrontation Clause protections; rather it rejected attempts to cure any potential error under the Confrontation Clause with a limiting instruction.  Consequently, even after <u>Crawford</u>, the holding of <u>Bruton</u> remains that the constitutionally erroneous admission of an accomplice's confession implicating the defendant cannot be cured by a limiting instruction.  In order for the rule in <u>Bruton</u> to be implicated, however, there necessarily must be an underlying violation of the Confrontation Clause.  Under <u>Crawford</u>, if a co-defendant's statement is not testimonial, admission of the statement does not amount to a Confrontation Clause violation.  <u>See</u> <u>Crawford,</u> 541 U.S. at 53-54; <u>see also</u> <u>Whorton</u>, 127 S. Ct. at 1183.  Because the admission of de Lima's testimony about the statements made to her by Mario did not violate Anderson's Sixth Amendment right to confrontation under <u>Crawford</u>, <u>Bruton</u> is not applicable.

Anderson further claims that admission of Mario's statements violated her right to due process.  In order to be cognizable under 28 U.S.C. § 2254, an error in the interpretation or application of state law must be so egregious that it renders the trial fundamentally unfair in violation of the Due Process Clause of the Fourteenth Amendment.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 72-73 (1991); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991).  Here, the evidence shows that Anderson was convicted of first degree murder on a robbery felony murder theory.  As the state court of appeal explained, evidence that Mario intended to steal Barry's money (by selling him fake contraband) was relevant to establish the elements of felony murder:

> [T]he boyfriend's statement provided circumstantial evidence that defendant's claim to have gone to the victim's room merely to take drugs was not true. The fact that defendant went to the victim's room with a person who intended to obtain money from the victim in a criminal manner is evidence that the jury could consider in evaluating her story, its credibility, and her subsequent criminal conduct.

Exh. 12 at 20.

**United States District Court**
For the Northern District of California

1   Because there was a permissible, relevant inference to be drawn from Mario's state of

2   mind, the admission of such evidence against Anderson did not violate due process.

3   Finally, even if the admission of Mario's statements amounted to constitutional error,

4   Anderson is not entitled to relief unless the error had a "substantial and injurious effect or

5   influence in determining the jury's verdict." Brecht, 507 U.S. at 637.  As the court of appeal

6   observed, there could have been no prejudice from the jury's consideration of Mario's statement

7   that the victim had twenty and fifty dollar bills because that fact was not in serious dispute at the

8   trial and had no significant bearing on Anderson's guilt.  Given Anderson's own admissions of

9   guilt and the relatively insignificant inferences to be drawn from Mario's out-of-court

10  statements, this court finds that any error in admission of the statements did not have a

11  "substantial and injurious effect or influence in determining the  jury's verdict." Id.

12  Based on the above, the court finds that the state court's rejection of Anderson's

13  Confrontation Clause claim was not contrary to or an unreasonable application of clearly

14  established federal law and that the admission of the contested statements did not have a

15  substantial and injurious effect or influence in determining the jury's verdict.  Accordingly, this

16  claim for habeas corpus relief is DENIED.

17

18  E.    Certificate of Appealability

19  The federal rules governing habeas cases brought by state prisoners require a district court

20  that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling.

21  See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1,

22  2009).  To obtain a COA, the petitioner must make "a substantial showing of the denial of a

23  constitutional right."   28 U.S.C. § 2253(c)(2).   "Where a district court has rejected the

24  constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:

25  The petitioner must demonstrate that reasonable jurists would find the district court's assessment

26  of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

27  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA

28  standard.

Here, the court finds that one issue presented by Anderson meets the above standard and accordingly GRANTS the COA as to that issue. <u>See</u> <u>Miller- El</u>, 537 U.S. at 322. The issue is whether the state court reasonably determined that Anderson did not invoke her Fifth Amendment right to counsel when she made the statement "I need a lawyer" after she had been placed under arrest but prior to advisement of her <u>Miranda</u> rights. <u>See also</u> discussion of pre-<u>Miranda</u> invocation of right to counsel in <u>Sessoms v. Runnels,</u> 691 F.3d 1054 (9th Cir. 2012), vacated and remanded "for further consideration in light of <u>Salinas v. Texas,</u> —— U.S. ——, 133 S.Ct. 2174, —— L.Ed. —— (2013)", 133 S.Ct. 2886 (June 27, 2013).

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals. <u>See</u> Fed. R. App. P. 22(b); <u>United States v. Asrar</u>, 116 F.3d 1268, 1270 (9th Cir. 1997).

### CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. A COA is GRANTED with respect to Anderson's claim of the denial of her Fifth Amendment right to counsel; a COA is DENIED as to all other claims.

This order terminates Docket no. 16 (Anderson's motion requesting the court to rule on the petition) as moot.

The Clerk of the Court shall enter judgment in favor of respondent and forward the file to the Ninth Circuit.

IT IS SO ORDERED.

DATED: August 19, 2013

_____
SUSAN ILLSTON
United States District Judge

**United States District Court**
For the Northern District of California

29